JULIA MAY WOLFSON, Appellee, v. JEWETT LUMBER COMPANY et al., Appellants.

No. 39724.

NOVEMBER 21, 1929.

REHEARING DENIED APRIL 14, 1930.

*Miller, Miller & Miller,* for appellants.

*Parrish, Cohen, Guthrie, Watters & Halloran* and *Stuart S. Ball,* for appellee.

GRIMM, J.—On September 30, 1927, about midnight, at a time when Julia May Wolfson was 12 years of age, she was in-

246

jured while riding in an automobile belonging to and driven by one Chapman. At the scene of the accident, Twenty-fourth Street runs north and south. Kingman Boulevard, running east and west, ends on the west side of Twenty-fourth Street. Cottage Grove Avenue, running northwest and southeast, intersects both Twenty-fourth Street and Kingman Boulevard, where Kingman Boulevard and Twenty-fourth Street come together. There is a double street-car track on that part of Cottage Grove Avenue east of Twenty-fourth Street. It runs and extends, by a suitable curve, north into Twenty-fourth Street, north of the intersection of Twenty-fourth Street, Kingman Boulevard, and Cottage Grove Avenue. At the northeast corner of this intersection is what is known as Drake Park. At the west of Twenty-fourth Street and north of Cottage Grove Avenue is a church. Kingman Boulevard has a center parking, with a driveway on the north and a driveway on the south of this center parking. At the time of the accident, there were five street lights in this intersection. East of Cottage Grove Avenue it is 42 feet from curb to curb. Twenty-fourth Street south of Cottage Grove Avenue is 24 feet, and north of Cottage Grove Avenue it is 38 feet from curb to curb. The center parking in Kingman Boulevard begins approximately 100 feet west of the west curb line of Twenty-fourth Street. The entire territory is substantially level. Drake Park, at the northeast corner of the intersection of Cottage Grove and Twenty-fourth Street, is approximately 4 feet above the surrounding grade, but there are no obstructions of the view of North Twenty-fourth Street from Cottage Grove Avenue, or of that portion of Cottage Grove Avenue east of Twenty-fourth Street as one drives south on Twenty-fourth Street, approaching Cottage Grove Avenue. The defendant Homer Jewett was a student at Drake University, and the son of D. L. Jewett, secretary of the Jewett Lumber Company, the latter being one of the defendants. About midnight of September 30, 1927. Homer Jewett was driving south on Twenty-fourth Street, approaching its intersection with Cottage Grove Avenue, driving a car belonging to the Jewett Lumber Company. At the same time, Chapman was driving a Peerless Sedan westward on Cottage Grove Avenue, approaching Twenty-fourth Street. In the car with Chapman was the plaintiff, then 12 years of age, and her mother, both sitting in the rear seat of the car driven by

Chapman. There were also in the car with Chapman a daughter, who was sitting in front, and his wife, who was in the rear seat, with the plaintiff and her mother. Chapman intended to proceed west across Twenty-fourth Street, and on west on Kingman Boulevard. The cars collided in the intersection. Chapman's car was overturned, and the plaintiff was injured.

I. It clearly appears that the plaintiff was a mere gratuitous passenger in the Chapman car, without any control over its operations, and not in any manner engaged in any common enterprise with the driver of the car. It also clearly appears that she was without negligence on her part.

II. Section 5035 of the Code, 1927, then and still in force, is as follows:

"Preference at intersecting points—alleys. Where two vehicles are approaching on any public street or highway so that their paths will intersect and there is danger of collision, the vehicle approaching the other from the right shall have the right of way, provided, however, that such vehicles coming from alleys and private drives, where view is obstructed, shall stop immediately before entering a public street or highway."

It is strenuously contended by the appellant that, because of the provisions of said section, it was the duty of Chapman when, on approaching Twenty-fourth Street, he discovered the Jewett car coming south on Twenty-fourth Street, to stop his car and give Jewett the right of way, and that, because he did not do so, and a collision occurred between said cars, plaintiff cannot recover.

Chapman testified that he was an experienced driver; that he was familiar with the crossing, having crossed it nearly every day for many years; that, when he was approaching Twenty-fourth Street, he was driving about 20 miles an hour. We quote from the abstract of his testimony:

"As I entered the intersection there [Kingman and Twenty-fourth], going west, I observed an automobile. When I first saw it, it was about 60 or 65 or 70 feet north of the north line of the intersection, and on Twenty-fourth Street. Going my usual route, I saw a car on Twenty-fourth Street, going at a

good rate of speed. When I got out in the middle of the street, just about the middle of the west street-car track, I saw the car was coming right at me, so I turned to the left, which would be on the wrong side of the street, trying to dodge the approaching car; and the car was coming on me at such speed, I turned, thinking he was past me; and it seems, in place of passing me, he turned to his right, and turned right at me, and hit me on the back wheel, and laid me sideways,—turned us over.''

The testimony shows that the car, when turned over, was about 4 feet past the west line of Twenty-fourth Street, in Kingman Boulevard. The top of the car was turned toward the south, and was lying three or four feet north of the south curb line of Kingman Boulevard. He further testifies:

''I imagine Jewett was driving about 40 or 45 miles an hour at the time he collided with me. I had entered the intersection before Mr. Jewett entered this intersection. I was clear past the intersection before he struck me.''

On cross-examination, Chapman testified:

''That I looked north after I entered the intersection, and saw a car about 65 feet north of the corner of the church [the northwest corner of Twenty-fourth and Cottage Grove]. He was not in the intersection, but I was in the intersection. I saw the car was about the middle of the church building. It was a very light corner, and I thought I had plenty of time to go across. When I got up to the corner, and got over to the middle of the intersection, then I saw this car coming from the north, then I swung my car to the south, and turned to the left, to try to avoid his hitting me right in the middle of the car. I was past the intersection when I turned to the left.''

At another place in cross-examination, he says: ''I saw I was in the middle of the intersection when I saw this car coming from the north.'' At another time in cross-examination, he said:

''I first saw it [the Jewett car] way back there, because that is the natural way when you come to an intersection, you look and see whether there are any cars coming for that particular point.''

According to the scale drawing introduced in evidence, the most southerly point of the church in controversy is about 100 feet north of the center of the intersection of Twenty-fourth Street and Cottage Grove Avenue. The defendant Homer Jewett testified that, immediately before the accident, he was traveling south on Twenty-fourth Street, not to exceed 25 miles an hour.

"The middle of the car was over the west rail of the west set of tracks. As I approached the intersection of Twenty-fourth Street and Cottage Grove, I noticed another car, about 120 feet east of the intersection on Cottage Grove, traveling northwest on Cottage Grove. That I could see this Chapman car by looking across the corner of Drake Park."

He then states:

"My car got into the intersection before the Chapman car. Just as the Chapman car entered the intersection, it swerved to the south. I continued south, released my brakes slightly, as I thought it was their intention—I had put on the brakes, as I naturally would, coming into an intersection. The Chapman car had turned south, then as it was about a car's length from me, it swerved over to the west again,—swerved north * * *. When it turned toward the west, or northwest, I was practically two car lengths from it, northwest. I applied my brakes instantly, and continued south."

Jewett further testified:

"The Chapman car came into the intersection at a speed of 30 to 40 miles per hour."

There is no apparent conflict that the right front of the Jewett car and the right rear of the Chapman car struck. Jewett further testified:

"I say the Chapman car came into the intersection after I did."

At another place in the examination, Jewett said:

"When I first saw what turned out to be the Chapman car, I was approximately two car lengths north of the intersection of Twenty-fourth and Cottage Grove, 28 or 30 feet north of the north line of the intersection. At that time, the Chapman

car was about 120 feet east of the east line of the intersection. At that time, I determined he was going somewhere between 30 and 40 miles an hour, and at that point, I was going not to exceed 25 miles an hour. As I first perceived the Chapman car, I began slowing down.''

Mrs. Chapman testified that, just before the Chapman car came to Twenty-fourth Street, they were driving 20 to 25 miles an hour, and that, when she first saw the Jewett car, which was when the Chapman car was in the middle of the intersection, the Jewett car was coming about 45 miles an hour. Mrs. Chapman further testifies that, when she first saw the Jewett car, it was about a half a block north of the intersection.

A witness Johnson testified that he was riding a bicycle west on Cottage Grove Avenue, at about 15 miles an hour; that the Chapman car passed him, and went two blocks while he traveled one on his bicycle. He estimates the speed of the Chapman car at 25 to 30 miles an hour.

There is some other evidence of the same general character. Upon such a record, it is claimed by the appellant that, by reason of the quoted statute, it was the duty of Chapman to stop his car and permit Jewett to drive south on Twenty-fourth Street. The appellant also indulges in much argument which would be material if this were a suit by Chapman against the defendant, but which loses its force and effect in the case at bar; for, under the circumstances, the plaintiff is in no wise charged with any negligence of Chapman's, unless the defendant Jewett is wholly without negligence and the negligence of Chapman was the sole proximate cause of plaintiff's injury.

The contention that it was the unqualified duty of Chapman, in obedience to the statute, to stop his car before entering the Twenty-fourth Street intersection and permit the Jewett car to pass south, cannot be sustained. In *Shuck v. Keefe,* 205 Iowa 365, this court said:

''The court also instructed that a party approaching a crossing and not having the right of way is required to exercise reasonable diligence to ascertain if another, with a right over the crossing superior to his, is approaching; and if the view is obstructed, in whole or in part, he is required to exercise proportionately greater diligence than if unobstructed. In other

words, he is bound to approach the crossing on the lookout, prepared to yield the right of way, if necessary, to a car coming from his right; but in approaching such crossing, a traveler may assume that one approaching on a highway is traveling at a lawful rate of speed, unless from his observation he is apprised to the contrary; and likewise, a traveler approaching a crossing under circumstances entitling him to the right of way may assume that a traveler upon the intersecting highway will comply with the law, and grant him the right of way, unless, from all of the circumstances, and his observation, he is apprised to the contrary. * * * Rules of the road prescribed by statute must be read in the light of the facts and in the light of common sense. The right of precedence at a crossing, whether given by law or established by custom, has no proper application, except where the vehicles on the intersecting street approach the crossing so nearly at the same time and at such rates of speed that, if both proceed, each without regard to the other, a collision between them is reasonably to be apprehended. If a traveler not having such right of precedence comes to the crossing and finds no one approaching it upon the other street within such distance as reasonably to indicate danger of collision, he is under no obligation to stop or wait, but may proceed to use such crossing, as a matter of right.''

Under the conflict of the evidence in this case, and in view of the holdings just quoted, it was for the jury to determine, and not for the court to determine, as a matter of law, whether Chapman should have yielded the right of way to Jewett. If the record were such that, as a matter of law, the court could hold that Jewett was guilty of no negligence, then a different question would have arisen; but, inasmuch as there is a conflict in the testimony upon several points, such as who first entered the intersection, where each car was seen by the driver of the other, the rate of speed of each of the cars, then it became a question for the jury to determine all controverted questions of fact, and the court did not err in refusing to direct a verdict for the defendants upon the basis of the failure of the Chapman car to yield the right of way to Jewett. Furthermore, the trial court's instruction on the subject is well in keeping with this court's rulings in *Shuck v. Keefe,* supra, and without prejudicial error.

III. It is claimed by the appellants that the negligent acts

252

of Chapman were the proximate cause of the accident, and that, for that reason, the appellants' motion for a directed verdict on that ground should have been sustained, or appropriate requested instructions on the subject should have been given.

There is sufficient evidence in the record to warrant the jury in finding that Homer Jewett was negligent immediately before and at the time he drove into the intersection in question and his car collided with the Chapman car. It certainly cannot be said, as a matter of law, that Jewett was not guilty of negligence in connection with the accident. Even if negligence on the part of Chapman in connection with the accident is conceded, the appellants were not entitled to said requested relief. In the recent case of *Judd v. Rudolph*, 207 Iowa 113, this subject received consideration. This court reaffirmed the rule in *Rice v. Whitley*, 115 Iowa 748, as follows:

"If defendants' original and continuing wrong operated proximately in producing the damage, they are liable, even though there was another concurring cause operating at the same time to bring about the result."

We also quoted with approval from *Gould v. Schermer*, 101 Iowa 582, as follows:

"[It] is well settled that the mere fact that some other cause operates *with* the negligence of the defendant to produce the injury does not relieve the defendant from liability. His original wrong, concurring with some other cause, and both operating proximately at the same time in producing the injury, makes him liable, whether the other cause was one for which the defendant was responsible or not." (Citing cases.) (Writer's italics.)

In the case of *Judd v. Rudolph*, supra, the court said:

"Again, where several proximate causes contribute to an accident, and each is a sufficient cause, without the operation of which the accident would not have occurred, it may be attributed to all or any of the causes; but it cannot be attributed to the cause unless, without its operation, the accident would not have happened."

It would serve no good purpose to enter into an analysis of what took place at this intersection. The fact that there is sufficient evidence in the record to warrant the jury in finding that Jewett was guilty of negligence in connection with the accident warranted the trial court in refusing to sustain appellants' motion for a directed verdict, as requested.

We have carefully examined Instruction No. 4, of which the appellants complain, and we find that it contained no prejudicial error. In so far as the alleged negligence of Chapman is concerned, it is very favorable to the appellants.

IV. The appellant the Jewett Lumber Company contends that the car being used by Homer Jewett at the time of the accident was the property of the Jewett Lumber Company, and was being used by Homer Jewett without the knowledge or consent, expressed or implied, of the company, and that there was no sufficient evidence to warrant the jury in finding against the Jewett Lumber Company.

Homer Jewett is the son of D. L. Jewett. The latter was secretary, manager, and director of the Jewett Lumber Company. Another son of D. L. Jewett's, Gerald Jewett, was connected with the Jewett Lumber Company. It appears the car in question was used by different members and employees of the Jewett Lumber Company as a business car, and frequently by members of the Jewett family as a pleasure car; that at times it was kept at the home of Gerald Jewett; but that, on the evening in question, before the accident, and on many other occasions, it was at the home of D. L. Jewett.

The only direct testimony concerning the authority of Homer Jewett to use the car was given by Homer Jewett himself and his father, D. L. Jewett. Without setting out the testimony, we may say that D. L. Jewett denied that Homer Jewett drove the car on the evening in question either with the knowledge or consent of the said D. L. Jewett, and that, according to the claim of the father, who seems to have been in charge of the automobile of the Jewett Lumber Company, Homer was required to get consent before he could drive the car. Homer Jewett, on direct examination, said, among other things:

"I had been driving that car practically every day since it was bought, in November, 1925. I did not drive it to school.

Practically all the time, I was given permission by my father to drive the car, and I had been driving it prior to this occasion, with his knowledge and consent. I had not been given his permission on this occasion to drive the car. He didn't object to my using it this night. I had been using it since 1925, and going practically wherever I desired to go; but I did consult him several times, upon the driving of the car. I had used it for my own pleasure, to some extent."

On cross-examination, he said, among other things:

"When I wanted to use this car, as a rule I asked my father whether I could use it. On this particular occasion, I had not asked to use it. I had been in the habit of asking to use it, and when my father gave permission, I would use it; but when he didn't give permission, I didn't use it. This time I hadn't even asked for it,—didn't consider it was necessary. * * * Q. You just went out and took the car and drove away? A. Yes, sir. Q. You had done that before, hadn't you? A. Yes, sir. Q. A great many times? A. Not without his consent,— no, sir. My father was at home this night when I left the house, but I didn't tell him where I was going. I told my mother."

Further, on cross-examination, he said:

"Since the accident, I drive this particular car right along, and drove it frequently before the accident."

When D. L. Jewett was testifying on behalf of the defendant, his attention was, on cross-examination, called to a conversation with one Cohen, at a definite time and place, in reference to Jewett's statement to Cohen about Homer Jewett's having D. L. Jewett's consent to drive the car. The witness said:

"I do not think he asked me under what circumstances my son, Homer Jewett, drove the car that night."

Cohen testified as follows:

"Q. And if, at that time and place, he [D. L. Jewett] did not say to you this, or this in substance, that he [Homer Jewett] drove the car with his [D. L. Jewett's] permission and consent.

(Objection, and overruled.) A. That was his statement. He did.''

It will be here noted that D. L. Jewett was an officer and general manager of the company. His testimony is uncontradicted that he, as general manager, had, at all times in question, exclusive control of the use and operation of all automobiles belonging to the company, including the car in question. He was clearly shown to have had authority from his company to grant the use of the car in question if he chose so to do.

We need not here discuss the presumption of consent of the owner arising from possession by another party.

There is not much direct evidence in the record of consent given to Homer Jewett on the night of the accident. In fact, under the circumstances in this case, the plaintiff could not be expected to produce contradictory evidence of disinterested parties on the subject. The testimony of the defendants, however, against consent was not conclusive; for it could be rebutted by circumstances, taken together with the reasonable or unreasonable character of their testimony. As has been pointed out, some of the direct testimony of the Jewetts tends strongly to support the plaintiff's contention.

In the case of *Lange v. Bedell*, 203 Iowa 1194, in commenting on a state of facts of the same general character, this court said:

''The jury had the right to weigh the testimony of the witnesses in the light of all the facts and circumstances disclosed by the evidence, together with the reasonable or unreasonable character of the testimony. They were not bound to accept the statements of the witnesses as conclusive because not contradicted by other direct evidence, when, in the very nature of things, contradiction thereby was impossible. A question of fact was presented for the jury.''

The inference which arises from ownership places upon the owner the burden of showing that his automobile was not used with his knowledge or consent, expressed or implied.

''It is a wholesome rule that places upon the owner of a car the burden of establishing that the car was not being operat-

ed, at the time of an accident, by himself or under his direction, if such be the fact.'' *Curry v. Bickley,* 196 Iowa 827.

True it is that it does not require much evidence to overcome the presumption arising from ownership.

The evidence hereinbefore quoted is, in some respects, significant of consent to Homer Jewett. The Jewetts deny consent on the particular night in question, but the record as a whole tends to show that the car in question had been frequently used by Homer Jewett with the knowledge of his father. It strongly tends to show that, while occasionally, or even quite often, Homer had permission to use the car, nevertheless he frequently used it with the knowledge of his father and without his father's consent. Homer testified, when first on the stand, after stating that he did not have his father's consent that night, that he did not consider it necessary to ask his father for the car. While technically the car belonged to the Jewett Lumber Company, nevertheless the record as to the manner in which and by whom it was used puts it very nearly, if not quite, in the so-called ''family class'' rule. This car was being used by different members and employees of the Jewett Lumber Company. It was kept a part of the time at the home of Gerald Jewett and a part of the time at the home of D. L. Jewett, and certainly it was being used a great deal by the defendant Homer Jewett. When we consider all the facts in evidence on the subject, we think that, under the rule announced in *Lange v. Bedell,* supra, there was a proper question of fact submitted to the jury as to the liability of the Jewett Lumber Company.

The court's Instruction No. 8 on the subject of consent, expressed or implied, by the Jewett Lumber Company to Homer Jewett to use the car in question contains no error prejudicial to the defendant lumber company. In some respects, it is most favorable to it.

V. Appellant contends that the attorney for the appellee was guilty of misconduct in his closing argument to the jury, in that he made certain statements concerning the law applicable to the case; and that the court erred in refusing to give to the jury a requested instruction on the subject.

It appears that, during a part, at least, of the arguments to the jury, the judge was in chambers, with the door closed, performing, as it is claimed, marriage ceremonies. During this

 time a dispute arose between counsel in reference to the making of statements to the jury concerning the law. A record was made up, after the closing argument was finished, which we have carefully examined. We have said, in substance, that, where a trial proceeds in the absence of the judge from the room, it is presumed to be with the consent of the parties. Furthermore, the appellee claims that his statements concerning the law were made in reply to similar statements made by appellant.

The court gave an instruction on the subject, which we have carefully examined, and which we think properly directed the jury on the subject. It contains this sentence:

"You have no right to consider anything as law except it be given you by the court in these instructions, and you have no right to take the statements of any attorney as to what the law is, except the court give you an instruction to the same effect. In other words, you should consider only that to be the law which is given you by the court in these instructions, and these instructions only, and decide the case accordingly."

VI. It is contended by the appellant that the claim for damages as a result of permanent injuries was not submitted to the jury, and that the amount of the verdict is excessive, when limited, as appellant contends it must be, to pain and suffering, and without the inclusion of any recovery for permanent injuries. The court did submit to the jury, in stating the issues, the question of appellee's claim for permanent injuries. This was in no way withdrawn in any of the other instructions of the court. The instructions in regard to the various items of damages which the jury might consider in fixing the amount of their verdict were not as clear and definite as they might have been, but, when they are taken as a whole, we think it fairly appears therefrom that the jury were to understand that the appellee was entitled to recover for permanent injuries if the jury found that she had sustained such injuries. The evidence is without dispute that the injuries were of a permanent character. They were very severe. The period of hospital confinement was long. The recovery, such as it was, was very slow; there was resort to surgery to remove diseased bone; the suffering was

long and severe; and the evidence clearly shows that the injuries were of a permanent character. The court in its instructions stated to the jury clearly that the appellee was claiming for such permanent injuries, and we are constrained to hold that the jury could not have misunderstood the claims of the appellee in this regard, or misapplied the evidence in regard thereto. We find no sufficient basis upon which to predicate a reversal, or to further reduce the amount of damages as finally fixed by the trial court.—*Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, and KINDIG, JJ., concur.